Bill Dunnigan, Attorney for the Plaintiff Appellant I'd like to start with the purely legal issue of whether or not Section 1972.1e applies to exclusive dealings arrangements which involve only one service. Now, the brief factual context of this question is that Rabobank has created an exclusive dealing arrangement with bankruptcy trustees. If a trustee who uses software of BMS, Bankruptcy Management Solutions, they have to deposit all of their money of their estates with Rabobank and with no other bank. That exclusive dealing arrangement eliminated the need for Rabobank to compete for deposits of the trustees and that lack of competition, at least, eliminated the need for Rabobank to pay interest on those bankruptcy deposits. The district court ruled that this exclusive dealing arrangement did not violate Section 1972.1e. It made that ruling because it found that Section 1972.1e applied only to tying arrangements which involved more than one product and did not apply at all to exclusive dealing arrangements. The district court specifically held that the word other in Section 1972.1e unambiguously meant that the statute required in that subsection two different banking services. That was error. Here's why. The word other does not unambiguously mean two services. In Sections 1a through 1d of the same Section 1972, Congress used the word additional to mean that two services were required. Section 1971.e does not have the word additional. So it would seem that if Congress wanted to require two services out of Section 1e, it would have used the word additional rather than the word other. The word other, in our understanding, means it comes from another bank. Another bank, you say? Another bank. So the other depository services from somebody else. Yes, of somebody else. That's your whole claim. Yes. But if that's what Congress meant, why even have other in the statute? Why not just say some credit property or service from a competitor of such bank? Your Honor, it's a colloquialism. I agree with you that if you were to strike the word other, you would probably have the same meaning. I'm sorry, I didn't mean to attribute that point to you. But I agree that the word other is, for all practical purposes, redundant. It's like if you use the word in order in a sentence. That usually means nothing. But I think the key point to understand is that you can't say it is unambiguous given the use of the word additional. And the mere fact that you could, in a best-case situation for Rabobank, term the word redundant doesn't mean that that makes it the only interpretation. I mean, the counterexample is King v. Birdwell, where the Supreme Court last term said that the words exchange by the state just didn't mean anything. And that was okay. Now, if you look at the context of this statute, it is almost beyond dispute that it deals with exclusive dealings arrangements. Now, the key point here is this Senate report. The Senate report for this legislation specifically states, and this is at page 20 of our blue brief, quote, this section 104, which is 1972, prescribes tying, reciprocity, and exclusive dealings arrangements involving banks. Now, the overall purpose- That can include a lot of things, that last statement. Exclusive, well, it includes tying, and that's 1A and 1B. Reciprocity, which is 1C and 1D. And exclusive dealings, which is 1E. And that's exactly what this court said in the Davis case that this statute applied to. Now, the purpose of Congress in passing this bill, as demonstrated by the Senate report, demonstrates that it was both meant to address tying and meant to address exclusive dealings. And the Senate report, at the portion quoted at page 21 of our brief, says that the purpose of this section is to eliminate anti-competitive practices, which require bank customers to- and then there's some words dealing with tying, and then it continues- refrain from dealing with other parties in order to obtain the bank product or service they desire. So, the Senate report seems clear. For Rabobank to be right, it appears that the Senate report must be wrong. And in addition, the opinions of this court- But aren't you reading out of the statute other than a loan, discount, deposit, or trust service? Well, for- There's no ambiguity about that. It says that the customer can be required to take out another loan, discount, deposit, or trust service. Right? Doesn't it say that? Well, Your Honor, it says that in Section 1A. But it does not say that, Your Honor, in Section 1E. The exception is- No, in 1E, Your Honor, it's more limited. And I'm looking at page 18 of my main brief, and it says- E says at the end, quote, Other than a condition or requirement such banks shall reasonably impose in a credit transaction to assure the soundness of credit. So, the four examples which are set forth in 1A, and I believe repeated in 1C, are not repeated in 1E. And this is only a 1E case, Your Honor. Now, before moving on, in Daniels, the court said it quite precisely. This is page 20 of our main brief. This court has construed Section 1972 as prohibiting exclusive dealings practices. Those that attempt to prevent customers from dealing with other banks. So, given the Davis case and the Daniels case, for RoboBank to be right, at least four sitting judges of this court have to be wrong as to whether this covers exclusive dealings arrangements. Now- But you're saying, aren't you, that 1A and 1E can't be reconciled? Oh, no, Your Honor. 1A has to be discarded? No, no, no, no, Your Honor. 1A applies to a tying arrangement where there are two products, okay? And for those types of situations, you deal with the four safe harbors, loan, discount, deposit, or trust service. E is a different animal. E is an exclusive dealings type of contract where if you take a service from a bank, the bank, in our view, cannot lawfully prevent you from going and getting the same service from a competing bank. Well, it can do it if that is necessary to assure the soundness of the credit. Absolutely. No dispute about that, Your Honor. Right. Reading that correctly. But that's not our case. We're not dealing with a loan transaction or a credit transaction. We're simply dealing with a deposit service arrangement. Is that deposit where money goes in and out for one reason or another, or is that just something that accumulates until, I guess, the bankruptcy case is closed? Well, in a bankruptcy, even in a Chapter 7 case, you have money which is being collected from people that owe the money in the estate, and from time to time you usually have to pay interim expenses of the estate such as professionals. So there's some money in and out. It seems to me, and maybe I'm looking at it from a practical standpoint, it makes much more sense to have one depository. That's why they do this. Now, that's one contract, and you have all kinds of other things. To say that's forbidden, it seems to me, would upset what sounds to me like a reasonable bankruptcy practice. This isn't big money here in this particular thing. Well, but, Your Honor, let me address your last point first. This is big money here. How much? Well, if we take the word of the United States trustee back in 2011, the trustees in Chapter 7 cases held $2 billion. $2 billion, yes, sir. We have- Wait a minute, $2 billion where? In collectively banks of- Yeah, that's a lot of banks. Well, no, Your Honor, it actually in practice isn't a lot of banks because BMS has 50% of the market. They used exclusively RoboBank. The other competitor, Epic Solutions, had three or four banks that it was working with, and a small competitor had a couple of banks it was working with. So you'd have $2 billion concentrated in no more than a handful of banks. Now, the other point Your Honor made was it would be a good practice if you had money coming in and going out to use the same bank. It might depending on the estate, but if you have a situation where $2 million or so comes into the estate and RoboBank is paying you no interest on it, it very well makes sense to take $1.9 million out of that and put it in a bank which is paying you interest and use it in and out for the smaller amounts of money. The deal that RoboBank set up prevented that. Well, I don't understand a lot of the bankruptcy things, but it seems when you're dealing with money in and out, as you point out, someone has to have control of that and know where all the money is. Yes. And if you put it in another bank, you don't know where the money is. Unless the trustee has some, I don't know, the trustee would deal with two or three banks? There's no reason why the trustee couldn't deal with two or three banks. Okay. Well, I would agree, I guess, if I'm the trustee. It was very easy for the trustee to take a large chunk of money that wasn't going to be needed immediately and put it in a certificate of deposit in another bank in which they were going to earn interest. But the scheme which RoboBank has set up is precluding the trustee from doing that. RoboBank wins. It's getting interest-free money. BMS wins. It's getting a fee out of the estate. Maybe all of it, maybe some of it. And then the creditors lose because the creditors are not getting the interest, which RoboBank should be paying. Well, then that should be part of the law, then. You can't do that. Well, I believe it is part of the law. It says you have to pay interest on a deposit? No, it doesn't say you have to pay interest on a deposit. That would be a different law. But what this law does is to encourage banks to pay interest, is to say that one bank taking in a deposit from a customer can't tell that customer that they have to deposit all their money at their bank. Because if they've done that, then they've eliminated their need to compete for that money and their need to pay interest. So we really do have a law which, through competition, would result in the payment of at least some interest on these amounts. And RoboBank has sidestepped that with this exclusive dealing arrangement. As we all know presently, any deposit doesn't generate very much, under the present economic circumstances. That's true, Your Honor. But if we look at even a small interest rate of a tenth of a percent, on the $2 billion, which they're not paying interest on, there is tens of millions of dollars involved here. Okay. Well, you're talking about a lot of... I don't know enough about this to say what trustees do and what bankruptcy courts do and everything else. I didn't know a lot about this until I looked into it closely. It seems to me the key to Your Honor's analysis should be the Senate report. The Senate report says that you cannot have an exclusive dealing arrangement, and this Court has affirmed that at least twice. Well, if this Court has confirmed it someplace, okay. But I'm dubious about Senate reports. Davis, Daniels, Your Honor. I believe the white light is on. I'd like to reserve the rest of my time, if possible. That's fine. Okay, thank you, Mr. Donegan. Ms. Davis? Your Honor. Let me start with a big picture on this statute and what it means in the context of a practical arrangement between these parties. What happens here and what was alleged in the complaint is that a trustee who is in charge of running an account, a bankruptcy, needs a bank and certain software in order to facilitate them doing their reports. So they contract with a company like BMS to provide the software. Then BMS contracts with a bank, and that bank has to be approved by the U.S. trustee, has to abide by particular regulations, and has to be compatible with the software that BMS is running in order to serve the trustee. In this particular statutory regime, this is not an overreaching replacement of the antitrust laws for banking. What this is, it's all about tying. It's all about what? Tying, Your Honor. Tying. It's tying. These are tying claims. 1A, 1B are straight tying, as we know it in antitrust law. B and C are reciprocity tying, and 1E is a negative tie, meaning that there is a condition that if you want this banking service as a condition to that service, you cannot obtain another service from a competitor. And if we look at the words of 1E, the word other does have meaning because it's conjoined there with a competitor, an other product with a competitor. And the word obtain or not obtain there, and if you look at Grow versus Colonial Bank, obtain meets purchase, and they talk very much about how that means purchase. You can't purchase another product from another bank. The plaintiff appellant here has admitted there is no other product involved here. There's solely this product. There's no competitor out there. There's no prevention. There was no condition to that particular savings account or depository banking account for the bankruptcy. What they're saying is that BMS has a relationship with the bank, and the way that it's set up so that it runs efficiently for the trustee is that they want you to use the bank that they've gotten approved by the USTC, that's agreed to abide by the regulations, and that is compatible with the software that BMS has. What this statute does is it carves out a certain kind of... Who wants the trustee to use the bank? BMS, Your Honor. The software company wants just to be dealing with one bank? That's correct, Your Honor. They provide the software services that the trustee uses to generate their reports. This software has to be compatible with the bank so that they can all work together. That's how it works. There's three contracts in this particular case, one between BMS and Rabobank, one between BMS and the trustee, which is cited in the complaint, and that's the one that says you'll use our bank unless you object, and then there's a deposit agreement between the trustee and Rabobank for the depository banking account. Let me ask you this. Could there ever be a valid exclusive dealing claim under 1972 involving only one product, or is it your position that more than one product or service is always required? The latter, Your Honor. This is a tying statute, and the case law in the Seventh Circuit clearly says that this is an anti-tying provision. If you look at MidStates, Fertilizer, and even the Daniels and the Davis and the McCoy case that are cited by the plaintiff appellant, it's an anti-tying type of statute. That's how it works. If you're talking about exclusive dealing in the sense that we know it in antitrust, that's not covered here. That's covered under the Sherman Act and the Clayton Act, and this plaintiff knows that because they've sued BMS under the Sherman Act in another action. But here, because this banking statute has a lighter burden for the plaintiff, they want to get the bank under 1972, and they can't do that unless they show a tying claim. Let me ask you just something totally on a different topic. Was interest paid on the deposits? Interest was not paid. And why was that? That was a business arrangement, Your Honor. That's something that goes on in the minds of the business people, but let me just say this. What the bank has to do here, and I know that the bank does not make a lot of money on this, if that's what you're asking, what the bank has to do here is go through another whole layer of regulations. It has to abide by the bankruptcy rules as well as all the banking rules. It has deposits going in and out of the accounts. Many of these accounts are not very big. There's a lot of administration work that goes on with this. And what the bank was anticipating was holding funds with interest rates going up. As we all know, in this atmosphere, interest rates have not gone up. Thank you. I'm going to put on my glasses so I can see some of my notes. Traditional banking practices are specifically excluded under the case law from Section 1972, and that's really clear. If you read the cases, they say, well, Section 1972 covers these various acts, but it was not meant to cover just traditional banking practices. It was meant to hold the banks back from exercising some kind of power by conditioning these particular products with something else, with some kind of power in the tied product. So if you look at the case law, none of the cases that are cited by plaintiff's appellant have gone their way. Two of the cases, McCoy and Grau v. Colonial Bank, are both 12B6 cases. They granted the motion to dismiss, and it was upheld by the Seventh Circuit. The other cases were on summary judgment, and all of them, all of them, look at the banking practice in a very practical manner and ask, is this a traditional banking practice? And in this case, that's what this is. This is how it runs. This is how it goes. Let me just say two small points. One is about standing and who is in the shoes of the person best to bring a claim, if there was a claim here, and that is analyzed under the normal Section 4 of the Clayton Act. And the best case to look at that is MidStates Fertilizer, and it talks about the role, and specifically to this case, it talks about a creditor in a bankruptcy who stands far back from the trustee and the estate. And lastly, I just want to say one word about futility here. This is a case, as the plaintiff appellant has said, is a matter of law. It was perfect for the kind of abbreviated procedure below, and the plaintiff appellant was given plenty of opportunity to talk about what their case was, and the case was narrowed to 1E in this particular exception. And Grau v. Colonial Bank talks about, that's a 12B6 case, talks about if there's a judgment entered and the plaintiff's had an opportunity to move aside that judgment and hasn't, then it's not proper to remand it. And if you have no further questions, Your Honor? Okay. Thank you very much, Ms. Davies. Thanks very much. Mr. Donegan? Your Honor, let me start. What exactly? I have not gotten straight what McGarry... McGarry is not a competing bank, so it's not looking for money that was deposited in Rabobank. So what is going on here? It's the taking of the service fee by Rabobank without any bank... What does this have to do with McGarry? McGarry was a creditor of an estate which was deprived of, A, at least the interest... So it's a creditor of a bankrupt. A creditor in a bankruptcy, complaining that there should have been more money put into the bankruptcy as a result of the fee that Rabobank deducted and the credit, the lack of interest that Rabobank did not need to pay as a result of the fact that it did not need to compete for the funds of the bankruptcy estate. Was McGarry a member of a class of all this $2 billion that's somewhere? The estate was counted as part of that $2 billion or so that all trustees are holding. Is that what the target is, trying to find a class that would be able to cut into all these other... That's going to be largely unsecured creditors, Your Honor. It's what? That class, the people that are entitled to that $2 billion are largely going to be unsecured creditors. Some administrative creditors, but largely the people who are being injured are the people that would get more money rather than a fixed amount as a result of the float in that or the delta in that amount which is being held by the bankruptcy trust. I guess I'm just asking, is McGarry part of the class? What is McGarry? I don't understand.  It's a law firm, Your Honor. It was a creditor in a bankruptcy estate. It was a creditor of a bankruptcy estate. And the basic claim here is that if Raubow Bank did not violate Section 1972-1E, then Raubow Bank would have had to compete with other banks who are also approved by the United States Attorney for the money that that estate had to deposit and it would have needed to pay interest. It did not pay interest. In addition, it just took a fee... No, I'm sorry. I just don't understand. Okay. So Raubow Bank has been... In your view, Raubow Bank has been given too much money? Is that the idea? Not exactly, Your Honor. If I could try to put it in context. I want to make sure I... We start out with bankruptcy trustees. Bankruptcy trustees need software because they have to prepare reports. That's BMS. Raubow Bank realizes that those bankruptcy trustees need software. So Raubow Bank and BMS get together and they decide BMS is going to make all the bankruptcy trustees go to Raubow Bank. Raubow Bank is going to pay BMS a referral fee for allowing it to take in, without any competition, all of that money that the bankruptcy trustees have. The bankruptcy trustees then enter into an agreement with Raubow Bank in which they acknowledge Raubow Bank is going to take the fee out without any bankruptcy court approval and Raubow Bank is also not going to pay them any interest. Now, the injury to competition is once BMS, Raubow Bank and the trustees... What's the injury to McGarry? McGarry has not been able to receive an additional distribution that would have been represented by the interest that Raubow Bank should have paid if it had to compete. So in other words, what, the bankrupt estate is diminished because Raubow Bank hasn't paid interest? Yes, well, it seems to me that's an obvious proposition. So how much is the interest? Well, the interest for McGarry would have been in the neighborhood of $100. That's not why we're here. The reason we're here is this is happening across the United States with every bankruptcy estate and the sum total involved here is going to be in the neighborhood of $2 billion that banks have as a result of these exclusive dealings arrangements on which nobody is being paid interest and the bank is extracting a fee. It's a tens of a million dollar a year problem. But McGarry doesn't stand to obtain billions of dollars. No, no, this is a putative class action, Your Honor. I mean... It's the first time you've said that. I'm sorry? It's the first time you've said that. Yes, yes. It's a putative class action case. Yes. Okay. Okay, because look, no one is going to bring a claim. No, I understand. Okay, but see, we're here because this is a nationwide problem involving every bankruptcy estate. It is a serious problem. And this is the first time that I'm aware of that anybody has, this in our companion case, anybody has challenged this. And it seems that it is a clear violation. If the Senate report and Davis and Daniels are correct, then we have an exclusive dealings arrangement. If this is an exclusive dealings arrangement, McGarry has been injured by that because they received a reduced distribution from the bankruptcy estate as the result of RoboBank's failure to pay interest. And that's happening across the board. Okay. Did you ask to be, to have this certified as a class action? No, Your Honor. What happened here is- I don't see any reference to class action. It's in the complaint, Your Honor. What happened was we showed up at initial status. The defendant had made their motions, one, to compel arbitration, and two, to dismiss a couple of days before. We responded to the arbitration motion in writing. We thought we were going to get a briefing schedule on the motion to dismiss, and Judge Schader dismissed it at the initial status without any briefing and giving me maybe a minute or so to argue. I mean, I'm not saying that there was any damage as a result of what Judge Schader did because we're dealing with a legal issue here. Either Section 1972.1e covers exclusive dealings arrangements, or it does not. An additional argument in front of Judge Schader wouldn't have changed that result. That's up to Your Honors. Okay. Thank you, Your Honor. Okay. Thank you very much, Mr. Donovan. Mr. Davis? Ms. Davis. I'm sorry. This was your rebuttal. She's done. This was my rebuttal. We're all done. Thank you, Your Honor. Okay. Sorry about that. Okay.